Good morning, Your Honors. The issue before the court today is whether it was appropriate to grant a summary judgment in a case in which there are significant material questions of fact dealing with an attorney's disclosures to a third party for the express purpose of inducing that third party to provide loans to their client. And the material disputed facts arise out of the representations and the scope of those representations by respondent. Respondent in their briefs, answering briefs, continue to cite the incorrect standard, continue to say that their duty was simply not to make false or misleading statements. But that standard has been rejected by both the Ball Hunt case and the Jones Day case, cases that both respondents and appellants cite as controlling law in this area. And what those cases provide is that it is not merely what is said, but what is not disclosed that can be a basis for a breach of that duty. A half-truth is often as misleading as an outright falsehood. That was the Ball Hunt decision. When one does speak, he must speak the whole truth to the end that he does not conceal any fact which materially qualifies those stated. That's a Jones Day decision. And so respondents continued focusing on just the four corners of what they said specifically and expressly violates the public policy considerations. Well, in part what they said is that there are a lot of things that they're not opining on. And when they're not opining, you can't rely on they're not opining. And that's the problem I have with most of the, you know, alleged misrepresentations or nondisclosures that you rely on. They're either things that they say, we are making an assumption, but we don't know, and there's no evidence that they really did know. And then there's a whole variety of things where basically they say, you know, our opinion is quite limited. We're only going to opine on this and this and this, and you're over here with something else. Thank you, Your Honor. You've identified the critical public policy issue behind the defense counsel. It's not a public policy issue. It's a factual issue on this record. We're not concerned with public policy. We can read California law, but we still need to look at this record. And I think it's deficient, just speaking for myself. Thank you, Your Honor. If I may, when we look at the assumptions on which the opinions are based, we have to take that into context. And Your Honor just said something very important. If they make an assumption because they don't know, that's one thing. But there are significant factual disputes here as to whether, in fact, they did know. For example, when they make an assumption that CropUSA has clear and free title to the collateral, and here the collateral being all receivables, in this case from Diversify, the insurance company, when, in fact, they know that two years earlier in the exact same loan situation, when a default was called, the insurance company disputed that CropUSA had title to the collateral and stopped payments, which is exactly what happened in this case. You cannot make an assumption when you, in fact, have reason to doubt the truthfulness of that assumption, and that's what happened in this case. Respondents answering brief, docket 23 at page 16, they list for the court all of the assumptions that they made, seven of them. Every one of them was in dispute as to whether or not they had facts to the contrary. When Respondent Gatziolas, after the default was called, advises appellant that, in fact, he had doubts that Diversify would continue to pay the commissions once again. You're talking about the July 2013 statement? Yes. Right. But the letters were written a long time before that. And so if I tell you I know something today, it has no bearing on whether I knew it two months ago or three years ago. It's just not relevant. Well, would it make a difference if you were aware of it in 2008? Because that's when the default was called, long before the opinion letters were written. Nothing changed between 2008, when a default was called on that loan, and 2013, when GEMCAP called the default. To not connect the fact that he knew in 2008 seems not logical. That's not what the July 2013 statement was, I don't believe. That's exactly what was wrong. I knew this in 2008? No. Give me a record site for that. The default occurred in 2008. What happened? Well, he knew in 2013 that something happened in 2008, but that doesn't bear on when he knew it earlier. They were representing CropUSA when that loan was defaulted. They represented CropUSA in that loan. That's how he knew about it. It's not that he learned of it. But he was involved in that loan, and that's why he said, I always had doubts as to whether diversified would continue to pay. At the very least, Your Honors, that's a material question of fact, a material question of fact as to his knowledge, his intent, and reasonable reliance that should not have been decided on a motion for summary judgment. And that is not the only issue that had material facts. When the court finds that Mr. Gatziolas' statements that the litigation was not serious, really almost over, et cetera, and then there is a different statement to the shareholders that it might subject them to significant financial consequences, that's also a material misrepresentation. Now, the district court found that that was non-actionable prediction. But case law warrants that the difference between non-actionable prediction or opinion versus actionable misrepresentation is a question of fact that should be decided by a jury. These are questions of fact that should have precluded a summary judgment at this point. What was determined was duties were owed.  The summary adjudication by appellant for finding that duties were owed should have been granted. And the denial of that summary adjudication was error, and that should be reversed as well. We also have a misrepresentation, and I'm not going to take the court through every misrepresentation we've cited in our briefs, but these are material misrepresentations. Had a lender known that the collateral that was being pledged, the receivables, once they tried to call a default, would immediately be cut off by the insurance company, the originator of that collateral, would that have been material to a lender? I mean, I could say it's a question of fact, but it seems like a foregone conclusion that that would be material. And at the very least, as Ball Hunt said, that information should have been disclosed. The lender should have been able to assess its own risk based on fair and full disclosures. And that wasn't allowed because of respondents' breach of their duty. And that's why we believe that the motion for summary judgment should be reversed. It should be allowed to go to the jury with respect to causation, reliance, and damages. And motion for summary adjudication on duties should be reversed, and instead judgment entered on their behalf. I will reserve the remainder of my time. You may do that. Thank you. Good morning, Your Honors. Mark Brooks for Appellees Alzheimer, DLLP, and James Gatziolas. Your Honors, the case turns largely on the language of the two opinion letters. There's no dispute as to that language. Judge Liu's opinion is painstakingly detailed and comprehensive. After addressing a host of evidentiary and essentially MIL issues, he applied the law to the undisputed language. Summary judgment was and remains appropriate because the letters do not say what Jem Tapp says they say. What's your position with respect to the 2013 statement that's outside the opinion letters? Thank you, Your Honor. What Judge Liu found, and with which we agree, is that there is no evidence that Mr. Gatziolas would have known that Jem Tapp was lending against what they call the gross commissions. In other words, the evidence is, and it's in the record, that Kropp would provide a statement to Jem Tapp, and Jem Tapp would make a determination on a monthly basis as to how much to loan. And so because Mr. Gatziolas and because the letters and the agreement make clear that Jem Tapp was, Kropp was only pledging that to which it had right title and interest, it was up to Jem Tapp to determine how much it wanted to loan and whether it wanted to treat the commissions that were payable to the subagents as collateral. And that's borne out in the very language of the letters, if I could point that out. First of all, as you know, Judge Liu found that this issue was not raised in the pleadings at all and ought not to be considered on summary judgment, but he nevertheless addressed the merits. Collateral is defined as all the assets of Kropp, including, quote, all of the right title and interest of Kropp in and to commissions from diversified. So as Judge Liu pointed out, the key terms are that Kropp USA must still have, quote, the right title and interest to those commissions. And if Kropp USA did not have rights to the subagent commissions, then those commissions are not encompassed in the collateral or plaintiff's security interest. So what's clear is that Quarles never opined that the collateral included any particular portion of Kropp's future commissions. And GEMCAP and its counsel in New York were absolutely on notice of that. Quarles explicitly assumed, quote, without investigation, close quote, that the collateral exists and the borrowers have rights or title to each item thereof, close quote, and that Kropp, quote, has rights in the property in which they have granted a security interest, close quote. Under ordinary opinion letter practice, stated assumptions to the opinion recipient, the responsibility for confirming the assumed facts for itself, we're taking the risk that what is assumed might turn out to be untrue. So not only was Quarles telling GEMCAP, we are not promising you that Kropp has any right title and interest in any portion of its assets, including its income stream, but we are putting you on notice that we have made an assumption for purposes of this letter without investigation, meaning it's on you. It is on you. Opposing counsel's argument is that there would be a duty to disclose if it made that statement misleading and that there was actual knowledge that the payments to the subagents would take precedence. So how do you respond to that? Well, first of all. In other words, that the omission of that additional information was what was misleading. So the three key cases there are Roberts v. Ball Hunt, Vega v. Jones Day, and Prudential v. Dewey Ballantyne. And when you parse them, you understand exactly where this case fell out. Roberts and Vega involved representations that were affirmatively made or opinions that were affirmatively given, as to which the argument was the lawyer had a genuine basis for believing them to be untrue or incorrect at the time the opinion was given. Prudential v. Dewey Ballantyne, if you'll recall, is the case in which there was an error in the documents that gave the lender a security interest in I believe only 1% of the actual full amount of the loan. The last three digits were dropped. Excuse me. I think it would be 0.1% because it was 1,000th of the full amount. And the court had no trouble saying the lawyers had no duty to disclose the error even if they were aware of it. The key is that in Roberts, an explicit opinion was given that the entity was a general partnership, whereas the lawyers knew that a large number of the people who were being identified as general partners disputed that characterization. In Vega, Jones Day represented that a particular document was a standard agreement when they had knowledge that they were manifestly nonstandard terms. In other words, that which was disclosed related directly to that which was represented. Well, I guess the argument is that by saying we've done no investigation, that that isn't quite correct where Quarles represented crop at the time of the earlier default. Or that if it is true that there was no investigation, that itself is sort of a problem. So, you know, you've given a good explanation of those cases, but I have yet to hear you explain how this one tracks out. Your Honor, once we tell them that we are not telling you what portion of the commissions are the collateral, we're telling them. We're not telling you. But didn't Gatziolas make a representation that he was uniquely qualified because of his prior representation of crop to write this opinion letter? And he knew in advance that only a minute portion of the premium was going to be the actual collateral. Well, Your Honor, let me back up. It's not established in this record what the collateral is. Keep in mind that the Idaho court's decision was not admitted into evidence and is admissible solely for its persuasive, not admissible, but considered solely for its persuasive value. And we were not a party, and crop had defaulted. So crop's rights in that collateral were whatever they were. We don't really know what the collateral is. Didn't he make a representation that he was aware that whomever the other insurance company was, was going to pay the subs first? After the default had been declared, when he was attempting to arrange a workout, he certainly identified that as a risk. But that is not inconsistent with anything in the opinion letters, right? And it's not clear, by the way, that he identified that as a risk because Diversified would take the position that it wasn't collateral. Diversified had declared a default as to crop. We don't know why Diversified wasn't paying. Just as a business matter, that was a risk. And he was trying to get a workout, trying to, you know. But I think the key point here, we have to go back to this, which is there's nothing in the opinion letter that deals with gross commissions, that deals with an entire income stream, that deals with any representations as to what was and was not the collateral. And it's critically important that that type of opinion, which is manifestly different from the types of opinions that are being given here, opinions about corporate authority and the sufficiency of a lien agreement, are manifestly different from injecting the lawyer into the business side and talking about who's going to do what down the road. So I would point out that the letters themselves also expressly state that no opinions that are not expressly stated can be implied. And just turning to the knowledge qualifier, the knowledge qualifier does not apply to the opinions. It only applies to the litigation. And by the way, the notion, the representation that he said he was uniquely qualified related to the conversation in which he allegedly, and for purposes of this record, except that he made a representation that he would be uniquely qualified to make a statement about the litigation, not about the collateral. Turning to the litigation, I'm sorry. No, go ahead. I understand your point that they're not expressing any judgment as to the soundness of the transactions or anything like that, but just as to the legal requirements. What is the case that best expresses that principle? Well, I would say that the Prudential v. Dewey-Valentine case would be the case. There may be one of the others that actually gives you the sound bite, but in terms of the holding, that would be it. Gemcap also misconstrues the plain language of the litigation paragraph. And by the way, what Gemcap is trying to do with the litigation paragraph really exemplifies the point that I think you were taking your question in the direction of. It's the difference between getting a lawyer to opine on business and litigation issues and predictions on the one hand, and something cold and hard and legal opinion on the other. And so the litigation paragraph says that, to our knowledge, there's no lawsuit pending or threatened against crop that, quote, might adversely affect the validity or enforceability of any loan document. Validity or enforceability of any loan document. Which is completely different than saying that there's no litigation that could, you know, cause them to pay money to somebody for something. In light of the time, I'm going to take that question as an indication that I should move on. So turning to the statements outside the opinion letters, the borrower's disclosure schedule. I do want to point out, because I don't think it was adequately mentioned in our briefs, but it's in the record, that the loan and security agreement explicitly defines the borrower's disclosure schedule to be, quote, the disclosure schedule prepared by the borrower that is being delivered to the lender concurrently herewith. And it's not ratified by the lawyer? No. Right. Right. And borrower is defined as the two crop entities that are entering into the agreement. And the critical case there is the Janus Capital Group case, in which the Supreme Court spoke about, it's in the 10b-5 context, but it basically says that someone who helps someone prepare a statement is not the maker of the statement. And for obvious reasons, when a lawyer prepares a declaration for his client, or reps and warranties for a client, he's not adopting them. Finally, the representation that Gatziolis supposedly told Gemcap they ought not to worry about the litigation. It's a classic example of a casual expression of belief. The key cases, BLM v. Sabo and Deitch. And critically here, not critically, almost piling on, there's no allegation that Gatziolis was wrong. There's no evidence that he was wrong. It didn't result in a judgment against crop as far as the record shows, nor did it appear to be the reason why there was a default. Exactly. And in the record, there are excerpts from my deposition of Mr. Taylor, John Taylor, and it's absolutely clear in the testimony, Your Honor. Thank you very much. I'm just about out of time. Thank you, counsel. Ms. Hanna, you have a lot of rebuttal time remaining. Thank you. Let me start by following up on the last comment, the fact that the opinion with respect to the litigation was correct. That's exactly what happened in Ball Hunt. In Ball Hunt, the opinion letter reflected that the entity was a general partnership, although they had doubts as to whether or not that was true because there were some shareholders who disputed that. It turned out that they were right. It was a general partnership. And Ball Hunt said that's irrelevant. What's relevant is that you had doubts about that entity, and you failed to disclose those doubts to the lender. Well, apparently he had no doubts that the litigation wasn't going to be a problem. He thought it wasn't going to be a problem, and it wasn't a problem. So I'm not sure why Ball Hunt has anything to do with it. Well, doubts go to the issue of the collateral. Well, that's a completely different topic. We're talking about representations. Right, but each one has to be taken on its own. And if one is true, then you move on to another one because they're not just one big mass of misrepresentation. Each one, there has to be evidence with respect to each. With respect to the duty of full and fair disclosure, whether or not that disclosure was required to be made is based on whether or not the attorney had doubts. It doesn't even have to rise to the level of knowledge or actual knowledge. If they had doubts as to whether or not that representation was providing the full information to the lender so that they could make an informed decision, they were required. Where is all this in GEMCAP's own need to confirm things that are not said? I mean, this is somebody else's lawyer, right, that you're relying on, not your own lawyer. That's right. And where is there a duty to make an opinion one way or another about what the collateral is? That's exactly right. There's no duty to make a representation. And they didn't make one. I respectfully disagree, Your Honor. Once they do make a representation, there is no question as to what the collateral is. It's defined as all receivables, including commissions. It's not some subgroup of that. It's all receivables, including commissions. It's undisputed in the record that they knew that the borrowing base that was being used was based on all collateral, including all commissions, not gross, not net. It doesn't matter what you define it as. It's all the revenue stream coming into the borrower's account. That included those commissions. There were doubts by an attorney that was providing opinions for the lender to make and with the express purpose of them relying on those opinions to make that loan, in which they failed to disclose their doubts as to whether or not crop had clear and free title to that collateral. That is the very heart of the representation that is being made. The question is, can an attorney craft assumptions that they know to be untruthful and then base opinions on those assumptions and then point to that limitation to say, that fulfills the public policy of full and fair disclosure. I submit it does not. It is actually a breach of their duty of full and fair disclosure. When they say that they are not responsible for disclosures made by their client in disclosure schedule, that was rejected by the trial court. That was rejected in Jones Day. Jones Day held the defendants potentially liable for omissions in a disclosure statement prepared by those attorneys in connection with an opinion letter, just as in this case. There are disclosure statements that fail to provide for material contracts, fail to advise of litigation, and in which the defendants, the respondents here, I'm sorry, state that they have no information to believe that those representations were untruthful or inaccurate. That's what they say. How adequate was your client's due diligence? Our client's due diligence was that they had, the respondents had, unique knowledge that was not available to the lender, and that is why the lender made as a condition of the loan an opinion letter that held out that there was good and free title, that there was no material contracts that were not disclosed, et cetera. The letter was prepared for the express purpose for the lender to rely on it. To say that by relying on it, they did not do their due diligence, would sort of turn the purpose of the opinion letter on its head. Again, if the assumptions were being made because respondents had no information one way or the other, that would be okay. But here, there's at least material questions of fact as to whether or not they did have alternative information that would make them doubt the truthfulness of those assumptions. And then is it okay at that point to rely on those invalid assumptions to render an opinion and say we're only liable for what we said, not what we didn't say? That violates Jones Day. That violates ball hunt. And that violates their duty of care. Does the Court have any further questions for me? I don't believe so. Thank you so much for your time. Thank you. The case just argued is submitted, and we appreciate the helpful arguments from both counsel.
judges: Schroeder, Graber, Watson